IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Michael Anthony Richards          :

    Plaintiff                     : (Case No. 3:16-CV-598)

    V.                            : Judge Richard P. Conaboy

Carolyn W. Colvin                 :
Acting Commissioner of
Social Security                   :

    Defendant                     :

_____

**MEMORANDUM**

## I.   Background.

We consider here Plaintiff's appeal from an adverse decision of the Social Security Administration ("SSA") on his application for Supplemental Security Income Benefits ("SSI").  Plaintiff had filed his application for SSI on May 31, 2013.  The claim was denied at the administrative level on July 12, 2013 whereupon Plaintiff filed a request for a hearing.  Plaintiff's hearing was held on November 4, 2014 before the Administrative Law Judge ("ALJ"), Richard Zack.

On November 20, 2014, the ALJ issued a written opinion denying Plaintiff's application for SSI.  After Plaintiff requested review of the ALJ's decision, the Appeals Council, by notice of February 11, 2016, affirmed the ALJ's decision denying benefits.  The Appeals Council's action constitutes a final decision by the SSA and confers jurisdiction on this Court to hear Plaintiff's appeal

pursuant to 42 U.S.C. § 405(g).  The parties have briefed the issues (Docs. 16, 19, and 22) and this case is now ripe for disposition.

## II.  Testimony Before the ALJ.

On November 4, 2014, Plaintiff had his hearing before the ALJ. Testifying along with the Plaintiff were: Jeanette Dorsey and Heather Canfield, two lay persons who attested to Plaintiff's limitations; and Josephine Doherty, a Vocational Expert.  Also present was Plaintiff's attorney, Joseph Blazosek.

### A.   Plaintiff's Testimony.

Plaintiff's testimony may be summarized as follows.[1]  He was a poor student while attending Pittston Area High School from which he graduated in 2012.  For a time he was a special education student but at some point he was "mainstreamed".  He does not believe that being mainstreamed helped him and described his grades as "terrible".

Plaintiff has a seizure disorder that has afflicted him since he was a child.  He takes Lamictal for his seizure disorder and has been taking it since he was "a little kid."  He had his most recent seizure about one month prior to his hearing.  When he takes a seizure he feels lightheaded and then passes out.  When this happens he often bumps his head or bites his tongue.  He sees two physicians - - Dr. Kahn and Dr. Cook.  He also has treated at the

---

[1]See Record at pages 50-64.

Community Counseling Center but he discontinued treatment there when he enrolled at a Job Corps program in Drums, Pennsylvania. His other medications include Prozac for depression and Lipitor to control his cholesterol level.

Plaintiff is taking plumbing courses at the Job Corps Center. He states that his instructor tells him that he is "progressing pretty well" but that he has problems remembering what he has learned.  This often results in a scenario in which he must re-learn skills he had previously mastered.  Despite the fact that his teacher has told him that he's progressing well, his completion percentage for the tasks he has been assigned to learn is only 38%. Plaintiff states that he knows how to perform such tasks as running water lines, soldering, and disassembling and reassembling water heaters, washers, and dryers.

At the time of his hearing, Plaintiff was living at Job Corps Center.  He stated that he doesn't associate much with his fellow students because they are from distant places and not like him. One half of each day is spent in learning plumbing skills and one half of each day is spent on academics.  The only subjects Plaintiff is required to take are math and reading.  If he could reach a certain proficiency level in math and reading he would then be permitted to spend all his time practicing plumbing skills.  He admitted to some frustration because he wants to learn his trade but cannot manage to get a qualifying score in his academic

3

subjects.

Plaintiff has scant prior work history.  He worked at T.J. Maxx in a job that required him to stack boxes on pallets and then wrap them in tape to secure them.  He was able to perform this job but he could not do it at the required pace and was terminated.  He also worked briefly at Burger King, Arby's, Mohegan Sun, and Savo's Pizza but he encountered problems with managers who "would always get in his face and stuff."

Plaintiff also testified that his energy level is often low and he frequently tires.  The campus at the Job Corps Center is large and he finds the amount of walking he must do to be very tiring.  At the end of his day he usually goes back to his dormitory and sleeps or watches a movie.

### B.   Testimony of Jeanette Dorsey.

Testimony was also received from Jeanette Dorsey.[2]  Ms. Dorsey is Plaintiff's grandmother.  Ms. Dorsey stated that Plaintiff had lived by himself in an apartment on her block prior to enrolling at the Job Corps Center.  She saw him daily when they were close neighbors.  She has witnessed his seizures and testified that they have grown progressively worse as he got older.  When he was younger they would be what she described as "blank stare" seizures. But as he got older they became grand mal seizures in which he shakes, passes out, often bites his tongue severely, and wakes up

---

[2] See Record on pages 65-73.

approximately 20 minutes later disoriented and not knowing where he is. Ms. Dorsey testified further that since Plaintiff has been at the Job Corps Center (a period of approximately 8 months) he has had "at least two or three seizures that I know of". She stated that he does not manage his own medication and that the Job Corps distributes his medicine through its wellness center.

Ms. Dorsey also testified about Plaintiff's school background. She stated that when he was a freshman in high school he was having trouble navigating his way from class to class and a special arrangement was needed so that all his classes could be scheduled in close proximity. In his sophomore year it was determined that vocational training might be best for him and he took his academic subjects in the morning and was transported to the vo-tech school in the afternoon. He never really completed any class at the vo-tech school. He started to learn carpentry, woodworking, automotive repair, and then what Ms. Dorsey described as "security". However, he was constantly switching classes and never completed one.

Ms. Dorsey also stated that her grandson has little energy and that he has two speeds - - "slow and stop". She states that he needs to constantly be reminded of how to do things that he has done before. She indicates that he can seemingly learn to do things but is unable to retain the information a day or even an hour later. With regard to his inability to do things quickly, Ms. Dorsey stated that he was

5

fired at various jobs with Burger King, Arby's T.J. Maxx, and Savo's Pizza because he moves too slowly. She stated also that he lasted the longest (almost 90 days) at T.J. Maxx but he was let go because he could not meet their quotas.

### C.   Testimony of Heather Canfield.

Ms. Canfield's testimony may be summarized as follows.[3] She is a caseworker for Valley Youth House which runs a supportive housing program. She met Plaintiff because he had been referred to her employer in March of 2013. Ms. Canfield supervised Plaintiff while he and a roommate shared an apartment for approximately one year. The apartment was paid for by a series of grants. Plaintiff and his roommate were constantly at odds and frequently called the police to settle their disputes. Plaintiff lived in this volatile situation until he enrolled at the Job Corps program.

Ms. Canfield's role was to support Plaintiff by teaching him independent living skills. The program called for her to spend approximately two hours per week with each of the 22 people who comprised her case load. Her experience with Plaintiff was such that she needed to spend 8-10 hours with him alone. She would assist him with such things as grocery shopping, managing his money, household tasks, and even instructing him on personal hygiene. Her experience was that Plaintiff needed constant reminders to start and complete even routine, simple tasks. She rated his independent living skills

---

[3] See Record at 73-79.

as "maybe a four or a five."  Her agency ultimately determined that he needed a more structured environment where a supervisor lived on the premises to help him with day to day activities such as waking up on time to get to work, making and keeping appointments with doctors, and tending to his personal hygiene.  Ms. Canfield reported that she saw no improvement in Plaintiff's independent living skills in the year she supported him.  She became familiar with his manager at Arby's who, according to her, did not actually fire him.  The manager told her that Plaintiff could not keep up with the work and, as a result, finally stopped scheduling him for work.

### D.   Testimony of Josephine Doherty.

Ms. Doherty testified in the capacity of a vocational expert.[4] She testified that she had reviewed Plaintiff's file and listened to his testimony.  Ms. Doherty described him as a younger individual with a remote history of special education services who had no past relevant work history or earnings record.  The ALJ asked Ms. Doherty to assume a hypothetical individual with limitations including: a medically documented seizure disorder; the inability to climb ladders or scaffolds and work near unprotected heights, dangerous machinery, or to be exposed to excessive vibrations; the inability to work in an environment with extreme temperatures or humidity or exposure to dust, fumes or gases; the inability to lift 50 pounds more than occasionally or 25 pounds frequently; the ability to walk, sit, or stand for up to

---

[4] See Record at 80-84.

6-8 hours; an inability to work with the public or co-workers on a constant or frequent basis; the inability to work at a job that required him to report to more than one location; no restrictions with respect to the use of his hands for reaching, handling, fingering, and feeling objects; and that his work should be limited to tasks that required understanding, remembering, and carrying out only simple instructions and making only simple decisions.  Based on this hypothetical question, Ms. Doherty identified three jobs that such a hypothetical individual could perform.  These occupations were: (1) a medium duty, unskilled position as a hand packager; (2) a light duty, unskilled position as a retail marker; and (3) a light duty, unskilled position as a mail sorter.  When asked to incorporate and to assume the accuracy of the testimony rendered by Plaintiff, Ms. Dorsey, and Ms. Canfield regarding Plaintiff's problems in school, at work, and in the Job Corps training program, Ms. Doherty responded that, given those additional limitations, Plaintiff would be unemployable.

**III. Mental Impairment Evidence.**[5]

Plaintiff was identified as a special needs student upon entering ninth grade.  By all accounts, his scholastic performance was poor.  Consequently, he was assigned to vocational-technical school.  The

---

[5] While the record contains mention of some physical maladies - - chronic lack of energy and incontinence secondary to an anal fissure with rectal bleeding - - the Plaintiff finds no fault with the ALJ's decision not to identify these as severe impairments and, consequently, the Court considers this case on the basis of cognitive and behavioral limitations only.

record indicates that even in the vocational-technical environment Plaintiff found little, if any, success.  He switched his focus from carpentry to wood shop and then to automotive repair, but did not stay with any discipline long enough to develop proficiency.

Plaintiff has made several unsuccessful attempts at gainful employment with T.J. Maxx, Arby's, Burger King, and Savo's Pizza.  The record indicates that he was either released by these employers or they simply stopped scheduling him for work due to a common complaint - - he could not work fast enough to be useful in these settings.  He did not last long enough at these jobs to develop a relevant work history under the Social Security regulations.

Plaintiff has a long history of seizures that date back to his early childhood.  These seizures occurred periodically until at least one month before the November 4, 2014 hearing in this matter.  The seizures are copiously documented in the record and several witnesses who have observed them indicate that they caused Plaintiff to lose consciousness for up to 20 minutes and to then awaken in disoriented condition.  Plaintiff has been taking Lamictal in one form or another to try to control these seizures for years.

On February 23, 2013, Plaintiff was seen at Geisinger Wyoming Valley Emergency Room for a psychological evaluation at his mother's request.  The evaluation was scheduled due to Plaintiff's refusal to take his seizure medication, failure to attend to his hygiene, destructive behavior in the home, and sleep disturbance.  Plaintiff

was diagnosed at that time with depression and bi-polar disorder.

On February 25, 2013, Plaintiff was evaluated at Community Counseling Services for complaints of anger and depression. His diagnoses on this occasion were intermittent explosive disorder and depression. He was referred to one-on-one therapy because he declined to participate in group therapy.

On April 30, 2013, Plaintiff presented to Dr. Cook, who reviewed Plaintiff's medical history and noted ADHD with hyperactivity, manic-depressive disorder with attendant behavioral problems, and seizures. Dr. Cook saw Plaintiff again in June of 2013. At that time, Dr. Cook found that his seizures were stable. Dr. Cook's relevant diagnoses on that occasion were manic-depressive disorder and seizure disorder.

The medical records specifically document that Plaintiff suffered seizures on the following dates: April 15, 2013; May 30, 2013; August 20, 2013; and May 12, 2014. On each of these occasions Plaintiff received emergency room treatment.

Plaintiff was also seen by a neurologist, Dr. Kahn, on February 12, 2014 for an evaluation of his seizure disorder. At that time, Plaintiff's grandmother asked Dr. Kahn to prescribe Lamictal XR which had given Plaintiff good control in the past. Plaintiff had changed to Lamictal BID sometime earlier because he had lost his insurance. Because Plaintiff was then on the verge of going away to the Job Corps Center, his grandmother thought his seizures would be better controlled by Lamictal XR, an extended release medication that could

better accommodate the prospect of Plaintiff forgetting to take a dose.

Significantly, the record does not include any cognitive functions study or assessment of the severity of Plaintiff's mental or emotional impairments by any examining medical professional.

## IV.  ALJ Decision.

The ALJ's decision (Doc. 11-2 at 10-24) was unfavorable to the Plaintiff.  It included the following Findings of Fact and Conclusions of Law:

1.  The claimant has not engaged in substantial gainful activity since May 31, 2013, the application date.

2.  The claimant has the following severe impairments: seizure disorder, depressive disorder, autism, intermittent explosive disorder and history of ADHD.

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the

residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally. He is able to sit for six hours, stand for six hours and walk for six hours. He can understand, remember and carry out simple instructions. He can make simple work-related decisions and respond appropriately to co-workers, supervisors and the public occasionally. He can respond appropriately to usual work situations and changes in a simple, routine, and repetitive job. He can perform reaching in front and laterally, handling, fingering and feeling. The claimant cannot deal directly with the public or work as a team member constantly interacting with others. He cannot work in large crowds of strangers. He cannot climb ladders/scaffolds or be around unprotected dangerous heights, machinery or vibrations. He cannot be exposed to extremes of temperature/humidity or heavy concentrations of dust, fumes or gases.

5.    The claimant has no past relevant work.

6.    The claimant was born on October 4, 1992 and was

12

20 years old, which is defined as a younger
individual age 18-49 on the date the application
was filed.

7.    The claimant has at least a high school education
and is able to communicate in English.

8.    Transferability of job skills is not an issue
because the claimant does not have past relevant
work.

9.    Considering the claimant's age, education, work
experience, and residual functional capacity,
there are jobs that exist in significant numbers
in the national economy that the claimant can
perform.

10.   The claimant has not been under a disability, as
defined in the Social Security Act, since May 31,
2013, the date the application was filed.

**V.    Disability Determination Process.**

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[6]  It is necessary for the

---

[6]  "Disability" is defined as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less that 12
months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such
severity that he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in any

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. at 20).

---

other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really

15

> constitutes not evidence but mere conclusion.
> *See Cotter*, 642 F.2d at 706 ("Substantial
> evidence" can only be considered as supporting
> evidence in relationship to all the other
> evidence in the record.") (footnote omitted).
> The search for substantial evidence is thus a
> qualitative exercise without which our review
> of social security disability cases ceases to
> be merely deferential and becomes instead a
> sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required

16

so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision

17

is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII. Discussion.**

**A. General Considerations**

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted

18

"the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

    **B.   Plaintiff's Allegations of Error.**

    **1.   Whether the AlJ Gave Appropriate Consideration to the Testimony of the Lay Witnesses?**

Plaintiff alleges that the ALJ gave no consideration to observations made by two lay witnesses regarding the severity of Plaintiff's mental limitations.  While acknowledging (Doc. 16 at 14-15) that neither of these witnesses was an "acceptable medical source", Plaintiff points to SSR 06-03p that provides, inter alia, that evidence from "other sources" such as "public and private social welfare agency personnel", is valuable because "it may be based on special knowledge of the individual and may provide insight into the severity of the impairment[s] and how it affects the individual's ability to function."  Plaintiff contends that Ms. Canfield, who supported Plaintiff in his attempt to live independently for approximately one year, functioned in the nature of "social welfare agency personnel" as identified in SSR 06-03p. Based on the testimony that the Court has reviewed, it agrees that Ms. Canfield's observations, which were made on a foundation of 8-10 hours of constant contact with Plaintiff each week for approximately one year, were entitled to consideration in assessing the severity of

Plaintiff's limitations.   The question is whether Ms. Canfield's testimony, as corroborated by the testimony of Jeanette Dorsey, Plaintiff's grandmother, received appropriate consideration.

Ms. Canfield testified emphatically that in her frequent contact with Plaintiff over a period of one year she observed Plaintiff to struggle with some of the most basic activities of independent living. He could not wake up on time to get to work, attend to his personal hygiene, remember consistently to take his medication, or even remember from day to day how to perform simple tasks.  She stated that he was in constant conflict with his roommate and that their differences had to be resolved by the police on multiple occasions. She noted also that Plaintiff lost multiple simple, repetitive jobs because he could not keep pace with his work. She stated that after one year of supporting Plaintiff's effort to live independently she noted no improvement whatsoever.

The only discussion of Ms. Canfield's testimony in the ALJ's opinion states: "Ms. Cantfield" (sic) has testified about his [Plaintiff's] activities prior to entering Job Corps program and reinforces his need for repetition in learning."  This statement is in the midst of a paragraph that seems to couple Ms. Canfield's testimony with that of the grandmother and mention of a third party function report prepared by Patti Ann Dorsey, the Plaintiff's mother. That paragraph concludes: "most importantly, significant weight cannot be given to the statements because they are not consistent with the

preponderance of the opinions and observations by medical doctors in this case."

The ALJ's explanation is deficient in two ways. First, it does not adequately address or explain why Ms. Canfield's testimony was apparently accorded minimal significance or even rejected. Social Security Ruling 06-03p requires that the ALJ explain the weight given to non-medical sources. See Barnhart v. Colvin, 215 U.S. Dist. LEXIS 21670, 23-24(M.D.Pa.). Here, the ALJ has merely identified a portion of Ms. Canfield's testimony and given no indication why it was not entitled to some or even significant weight. Moreover, the principal reason for devaluing the testimony of Plaintiff's grandmother and of the report prepared by his mother appears to be the ALJ's conclusion that they "cannot be considered disinterested witnesses". The fact that a witness is a family member cannot be, without more, a reason for discounting that person's testimony. See Markoch v. Colvin, 2015 U.S. Dist. LEXIS 64382, 36-37 at n.2 (M.D.Pa.).

The second deficiency is found in the ALJ's statement that the lay witness statements could not be accorded significant weight "because they are not consistent with the preponderance of the opinions and observations by medical doctors in this case". The ALJ's rationale is insufficient here because no specific reference is made to any opinion or observation by a medical doctor. The Court simply cannot evaluate the propriety of the ALJ's assertion in this regard because the ALJ does not identify what opinion or observations by

medical doctors conflict with the statements furnished by Plaintiff's lay witnesses.  Accordingly, this case will be remanded for a more specific statement of why the lay testimony was rejected and in what respect it was inconsistent with information provided by any medical doctor.

2.     **Whether the ALJ's Residual Functional Capacity ("RFC") Determination adequately accounted for the Plaintiff's Difficulties with Concentration, Persistence and Pace?**

The ALJ found as a fact that Plaintiff had severe impairments including: seizure disorder, depressive disorder, bi-polar disorder, autism, intermittent explosive disorder, and history of ADHD.  Each of these impairments must be accounted for in determining the Plaintiff's RFC.  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d. Cir. 2005).  The ALJ's assessment of the Plaintiff's RFC was:

> ...the claimant could lift and carry 25 pounds
> frequently and 50 pounds occasionally.  He is able to
> sit for six hours, stand for six hours and walk for
> six hours.  He can understand, remember and carry out
> simple instructions.  He can make simple work-related
> decisions and respond appropriately to co-workers,
> supervisors and the public occasionally.  He can
> respond appropriately to usual work situations and
> changes in a simple, routine, and repetitive job.  He
> can perform reaching in front and laterally, handling,

> fingering and feeling.   The claimant cannot deal directly with the public or work as a team member constantly interacting with others.  He cannot work in large  crowds  of  strangers.    He  cannot  climb ladders/scaffolds or be around unprotected dangerous heights, machinery or vibrations, he cannot be exposed to  extremes  of  temperature/humidity  or  heavy concentrations of dust, fumes, or gases.[7]

(R.at 15).

Despite the ALJ's acknowledgment that Plaintiff had no fewer than six  cognitive  or  emotional  impairments  that  were,  by  his  own evaluation, "severe", the ALJ concluded that the claimant only had moderate difficulties with concentration, persistence, and pace.  More specifically, the ALJ found: "giving him the benefit of the doubt, the undersigned finds that the claimant has moderate difficulties in this area."  (R.at 14).  This finding would be entitled to more deference had the ALJ not also acknowledged that:

> Concentration,  persistence  or  pace  refers  to  the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate

---

[7] The ALJ's RFC determination was derived from a hypothetical question to the vocational expert that alluded to difficulty with concentration, persistence, and pace only by confining Plaintiff to the performance of simple, repetitive tasks.  As such, the hypothetical question was categorically deficient because confining a claimant to simple, repetitive tasks, without more, does not adequately account for difficulties with concentration, persistence, or pace.  Mascio v. Colvin, 780 F.3d 632, 638 (4th. Cir. 2015).  See also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d. Cir. 1987).

completion of tasks commonly found in work settings. Limitations in concentration, persistence and pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examinations or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

R.at 14).

Despite these acknowledgments by the ALJ, the Court must observe that the ALJ's opinion: (1) seemingly ignored testimony regarding the Plaintiff's inability to meet production quotas at several jobs where he was terminated after brief periods of employment; (2) points to no clinical examination or psychological testing; and (3) includes no mental status examination or psychological test data supplemented by other available evidence. Quite to the contrary, evidence tending to establish that claimant had significant impairments in maintaining concentration, persistence and pace (the testimony afforded by Plaintiff's grandmother and Ms. Canfield) was described as collectively insignificant without adequate explanation. Instead, the ALJ accorded significant weight to the findings of a non-examining psychologist who reviewed some of Plaintiff's medical file, notably physical examinations performed by a Dr. Cook in May and June of 2013,

and Plaintiff's school records from the Pittston Area School District. As noted by the psychologist (R.at 90) the documents he reviewed did not contain any medical opinion evidence.

While the opinion of a non-examining psychologist may, in certain circumstances, be entitled to significant weight, the Court finds that the scarcity of medical evidence in the record, the ALJ's failure to explain his rejection of lay testimony, and the limited nature of the review conducted by the non-examining psychologist in this case combine to deprive the ALJ's decision of the requisite substantial evidence necessary to support his findings. See Kent v. Schweiker, supra, at 114.

An ALJ has a duty to develop the record fully and fairly. Ventura v. Shalala, 55 F.3d 900, 902 (3d. Cir. 1995). This duty may entail procurement of an additional consultative examination to augment the record. (See. 20 C.F.R. Section 404.1519(a)(b)(4) (2007); See also Robaczewski v. Colvin, 2015 W.L. 4930115 at 9 (M.D. Pa. August 18, 2015). This record is simply inadequate and must be supplemented by a consultative examination by a medical doctor to obtain a functional capacity profile for this claimant, particularly with regard to his ability to maintain concentration, persistence and pace in even a simple, repetitive work environment. 2015). Because the Court finds that the record developed thus far is inadequate to determine the propriety of the ALJ's RFC determination in this case, a remand for further development of the record is necessary.

**VIII.      Conclusion.**

     For the reasons identified in the foregoing Memorandum, this case is remanded to the Secretary for further development of the record in keeping with the preceding discussion.


BY THE COURT


Date: December 9, 2016              S/Richard P. Conaboy
                                    Honorable Richard P. Conaboy
                                    United States District Court